Matter of Cheng v Worldco, L.l.c. (2003 NY Slip Op 51488(U))

[*1]

Matter of Cheng v Worldco, L.l.c.

2003 NY Slip Op 51488(U)

Decided on November 26, 2003

Supreme Court, New York County,

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 26, 2003

Supreme Court, New York County,
In the Matter of BARRY CHENG, Petitioner, - -
against
WORLDCO, L.L.C., JOHN G. MILLER and WALTER SCOTT BRUAN, Respondents.
Index No. 118075/03

For Petitioner:
LOUIS F. BURKE, P.C.
For Respondents:
SONNENSCHEIN NATH & ROSENTHAL LLP
By: Paul V. LiCalsi, Esq.

MICHAEL V. AJELLO, J.
Petitioner has brought this special proceeding pursuant to Article 75 of the CPLR, seeking either an order of attachment or a preliminary injunction in aid of arbitration.
Petitioner originally joined respondent Worldco, L.L.C. ("Worldco") as a day trader in 1997, classified as a Class C member. He subsequently left Worldco but rejoined it in August 2001, at which time he signed a "First Amended and Restated Operating Agreement" as well as a "Trading Protocol Agreement." He was terminated on or about July 1, 2002 and thereafter commenced an arbitration proceeding before the National Association of Securities Dealers, Inc. ("NASD") seeking to recover at least $816,104.00 in damages from Worldco as well as John G. Miller, chief executive officer of Worldco and Walter Scott Braun, whom petitioner claims is an executive who supervises Worldco's trading operations.
An order to show cause containing a temporary restraining order was granted by this court on October 17, 2003, restraining respondents from, inter alia, conveying, transferring or disposing assets to the extent of $816,104.00. Thereafter, this court vacated the temporary restraining order as to the individual respondents.
Petitioner, who is registered with NASD, alleged in the statement of claim in the arbitration that over the last several years he had observed that each day a small number of stocks "gap away from the tape" at the end of each day and tend to revert towards the last published price when trading resumes the following morning. In early 2001 petitioner began experimenting
with a gap basket program. He developed a strategy of placing offsetting buy and sell orders as a form of hedging above and below the last published price of a "basket" of a large number of different stocks. He placed "sell" orders at 50 cents above the last published price of each stock and "buy" at 50 cents below the price. He also placed a second set of matched buy and sell orders at $1.00 above and $1.00 below the last published price.
Although this strategy required petitioner to place a large number of orders, relatively few [*2]would gap away enough so that orders would be executed. Petitioner claimed that although overnight positions were discouraged at Worldco, there was no official policy regarding how much exposure one could carry overnight.
Petitioner conducted a test run for the full implementation of his Gap Basket Program on June 21, 2002. It resulted in a $10,000.00 profit for him. Based on the success of the program, he utilized it again on June 28, 2002. At 3:55 p.m. he placed 1250 orders $1.00 above and 1250 orders $1.00 below the last published prices. At 3:58 p.m. he placed an additional 1250 orders 50 cents above and 1250 orders 50 cents below the last published price. A larger than expected number of the selected stocks gapped away from the tape resulting in 133 orders being filled with petitioner assuming long positions worth $9.6 million and short positions of $15.7 million. After 5 p.m. he was summoned to the offices of senior management to explain the results of his trading and when he returned to his desk he discovered he no longer had access to Worldco's computer system.
Petitioner claimed that Worldco panicked and began a wholesale liquidation of his position in the after-hours trading market without his authority. He further alleged that had Worldco liquidated his account in an orderly manner throughout the day on July 1, he could have realized a profit of $523,104.00.
When petitioner returned to work on July 1, 2002, he found he was still locked out of the computer system and was informed that he was fired. Thereafter, Worldco sent him a "Separation and Release Agreement" which it wanted him to sign in exchange for $79,775.19, representing $56,409.41 as a return of previously contributed or retained capital and $23,365.78 as net trading profits allocated to him.
In the arbitration petitioner sought to recover damages for fraud, breach of contract, conversion, unauthorized trading, violation of New York labor laws and defamation.
At the outset, it should be noted that petitioner alleges that the sole basis for granting a preliminary injunction or an order of attachment is that the arbitration award may be rendered ineffectual (CPLR 7502 [c]). In a reply memorandum counsel for petitioner acknowledges that the Appellate Division, First Department, in Matter of Cullman Ventures, Inc. , v Conk,
252 AD2d 222, observed that petitioner therein, which was seeking a provisional remedy in connection with arbitration, had failed to show the award might be rendered ineffectual, that it applied the general criteria governing the issuance of a preliminary injunction and that petitioner had failed to demonstrate a likelihood of success on the merits, irreparable injury, or that the equities balance in its favor. However, he contended that Cullman Ventures and cases that follow it such as Erber v Catalyst Trading, LLC, (303 AD2d 165), failed to take cognizance of the strictures imposed by CPLR 7501 and 7502 and that the court should grant an order of attachment or preliminary injunction strictly upon the ground that the award may be rendered ineffectual. However, this ignores the fact that this court is bound by the rulings of the Appellate Division, First Department and must therefore consider whether petitioner is likely to succeed on the merits of the disputes to be arbitrated.
First to be considered is the relationship between petitioner and Worldco. Worldco claims that petitioner was a Class C Member. Petitioner claims that he refused to sign a
" Second Amended and Restated Operating Agreement" which provided that each new member of Worldco shall be admitted to membership only if he executes an appropriate supplement to the [*3]agreement by which he agrees to be bound by the terms and provisions thereof. He argues that since he never signed it, he never became a Class C Member of Worldco.
However, he signed a Trading Protocol Agreement on August 8, 2001 and he continued to be bound by the terms of that agreement which indicates he is a Class C Member. Thus, whichever rights he has against Worldco are the rights given to a Class C Member.
The first count in the arbitration statement of claim alleges fraud in that certain representations were made to him concerning his payout without disclosing that it was subject to change in the discretion of the managing member of Worldco.
The statements made to him were allegedly made before he signed the Trading Protocol Agreement which specifically states that the manager shall have no obligation to allocate any net trading profits to any trader for any bi-weekly period and the manager may vary the portion of net trading profits allocable to a trader for each bi-weekly period. Petitioner is an attorney and he must have scrutinized the agreement carefully before signing it since he crossed out the sections concerning deferral accounts and fees and expenses.
Where as here there is a conflict between the alleged prior agreement and the terms of the contract, that conflict negates any claim of reasonable reliance on the oral representation
(Doros & Brescia, P.C. v Farmington Casualty Co., 289 AD2d 56; Daily News, LP. v Rockwell International Corp., 256 AD2d 13).
The second cause of action alleges a breach of contract by Worldco unilaterally reducing his trading limit from $20 million to $15 million. Respondents admit they gave petitioner a $20 million dollar trading limit. Petitioner indicates in his last statement of claim that it was reduced
because of concerns with capital usage between 3:40 and 4:00 p.m., when trading volume is heaviest. However, he does not point to any agreement to continue the $20 million limit indefinitely and to never reduce it.
Petitioner further claims a breach of contract by Worldco failing to pay him any part of his capital account of $293,000.00. This should be considered in conjunction with his claim for conversion wherein he alleges that Worldco converted $293,000 from his account. Petitioner has not shown that the funds had been allocated to his account and Worldco claims that of the funds sitting in the account, most were still not allocated. The Trading Protocol Agreement explicitly provides that the manager shall have no obligation to allocate any net trading profits to any trader for any bi-weekly period. It should be noted that the amount Worldco claims it deducted as unallocated profit is the sum of $205,000.00. The balance in the account, which Worldco claims was approximately $285,000.00 prior to deducting the unallocated amount, would be the amount Worldco had previously offered to pay petitioner.
The fourth count by petitioner alleges unauthorized trading, in that Worldco liquidated his account without his permission. The Trading Protocol Agreement specifically provides that the trader appoints the manager as his agent with the power to execute trades, including liquidation of any one or more security positions held by the trader in the firm account. As to the allegation that Worldco did not liquidate his positions in a commercially reasonable manner, the record indicates that Worldco was put at risk by the overnight position. The first obligation of the managers was to liquidate the security positions to reduce Worldco's exposure, and not to liquidate in such a manner as to generate a profit for petitioner, especially since petitioner's actions were in violation of the agreement he signed. The Trading Protocol Agreement states [*4]that without the manager's consent, the trader shall not hold any overnight positions, and that no overnight short positions shall be permitted. Furthermore, it appears that all traders were advised on the afternoon of June 28, 2002, that except for Market-On-Close transactions, all outstanding orders had to be cancelled and all open positions liquidated by 3:30 p.m. Petitioner's actions on that day clearly violated the Trading Protocol Agreement as well as the instructions sent to all the traders.
It further appears that petitioner's claim that he would have realized a profit of $523,104.00 if Worldco had liquidated his account in an orderly manner throughout the day on July 1, is based on disposing of the various holdings at just the right time based on hindsight and the amount of unrealized profit is merely speculative.
The fifth count contained in the statement of claim is that Worldco violated the
New York Labor Laws. However, the agreement signed by petitioner indicates that he is not an employee but a member of Worldco.
The sixth and final count is based on a claim of defamation. He claims that Worldco falsely reported to the NASD that he had violated internal firm trading policies and/ or exposed the firm to substantial risk and could have "put the firm under." However, in a letter written by petitioner on July 8, 2002 to Al Guido, Worldco's chief trading officer, petitioner admitted that the sheer volume of his overnight positions was much more than Worldco "would allow" and as indicated above, the Trading Protocol Agreement provides that there shall be no overnight positions held without the manager's consent, and that no overnight short positions shall be held.
Moreover, the record indicates that the firm was placed at considerable financial risk. Consequently, there does not appear to be any viable defamation claim based on the report to the NASD.
As to petitioner's claim that members of Worldco's senior management told others that petitioner had exposed Worldco to a $50 million dollar potential loss and that he was trying to circumvent Worldco's capital limits and his conduct could have bankrupted the firm, while it is not clear exactly what the potential loss was that Worldco faced, it appears that the market value of the stocks in petitioner's overnight basket on June 28 was well over $500 million. While only $15,700.00 in overnight positions were executed, the possible exposure was much greater in view of the size of petitioner's baskets and the volatility of the market. As to whether petitioner's actions could have propelled Worldco into bankruptcy, petitioner himself, in his verified petition to this court, stated that Worldco has experienced significant financial difficulties. Worldco itself has acknowledged that they are attempting to avoid bankruptcy. Thus, the possibility of petitioner's actions throwing Worldco into bankruptcy, based on the potential loss that could have been sustained, leads to the conclusion that a claim of defamation would not be successful.
Aside from the fact that the papers submitted on this proceeding do not show a likelihood of success in the arbitration proceeding, they do not show that petitioner would be entitled to the requested relief even if he did show a likelihood of success. In view of the holding by the Appellate Division, First Department that the general criteria for orders of attachments and preliminary injunctions apply to arbitration matters (see Erber v Catalyst Trading, supra; Matter of Cullman Ventures, supra), petitioner would be required to show that Worldco was more than in financial trouble, but had done, or was attempting to do, an act such as disposing of, or secreting property(see Spiegel v D.H. Blair & Co., 289 AD2d 22, lv denied 97 NY2d 812; see [*5]also Matter of Ottimo v Weatherly Sec. Corp., 306 AD2d 287 [2nd Dept, 2003]; Spatz Ridge Lea Assoc., LLC, _____AD2d ____, 765 NYS2d 84 [4th Dept, 2003]).
The petition is denied and the proceeding is dismissed.
This is the decision and judgment of the court.
Date: November 26, 2003Enter: ____________________________
 J.S.C.
Decision Date: November 26, 2003